IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NATIONAL BUSINESS FORMS & PRINTING, INC., d/b/a GRAPHXONLINE.COM, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-08-1906 |
| FORD MOTOR COMPANY, | § § | |
| Defendant. | § | |

MEMORANDUM AND ORDER

Pending is Ford Motor Company's Motion for Entry of Judgment by Default, or, in the Alternative, by Summary Judgment (Document No. 60).[1]   After careful review of the summary judgment motion,

_____

[1] Ford's motion for default is based on Plaintiff not having filed an answer to Ford's counterclaims.  Ford's counterclaims are for infringement, dilution, and false designation of origin, and NBFP did file a responsive answer to those counterclaims when Ford asserted them in its initial Answer.  Later, NBFP filed a First Amended Petition, after which Ford filed an Amended Answer and reiterated the *same counterclaims* it had asserted with its initial Answer.  NBFP filed no additional answer to Ford's reasserted counterclaims, which are substantively identical to Ford's already pending counterclaims.   District courts have discretion to determine whether a default judgment is appropriate.  Lindsey v. Prive Corp., 161 F.3d 886, 893 (5th Cir. 1998).   Here, the issue was fully joined on Ford's counterclaims, which also are intertwined with NBFP's declaratory judgment claims, and all the counterclaims have been fully briefed on the merits by both sides and argued at length in the hearing on September 30, 2009.  *See* Jordan v. Sony BMG Music, No. H-06-1673, 2009 WL 185629, at *1 (S.D. Tex. Jan. 23, 2009); Mega Systems, Inc. v. Mazak Corp., No. 89-CV-1380, 1990 WL 193795 at *5 (D. Kan. 1990).   Ford made no mention of its default motion at the September 30 hearing, and thereby implicitly conceded it was without merit.  Ford's Motion for Entry of Judgment by Default is DENIED.

responses, and the applicable law, and having heard the oral arguments of both counsel at the hearing on September 30, 2009, the Court concludes as follows.

## I.  Background

Plaintiff National Business Forms and Printing ("NBFP") is a commercial printer that has advertised on the internet and manufactured certain signs, stickers, decals, and other promotional materials containing copies of Defendant Ford Motor Company's ("Ford") trademarked logos.  NBFP filed this action for declaratory judgment that it was not infringing Ford's marks after it received from Ford a letter demanding that NBFP cease selling products containing Ford's trademarked logos and turn over all counterfeit prints.  Ford counterclaimed under federal and state law.

Ford claims in its motion for summary judgment that NBFP has infringed and diluted approximately 12 to 15 of Ford's trademarked logos as a matter of law.[2]  As clarified by the arguments made at the September 30th hearing, the summary judgment evidence is that NBFP operates as many as four websites on the internet in which it advertises its ability to manufacture and sell various decals,

---

[2] These logos include the following: Ford's blue oval logo, the Ford Credit logo, the Lincoln logo, the Mercury logo, the Ford Mustang logo, the Ford F-150 logo, the Ford F-250 logo, the Ford Expedition logo, the Ford Explorer logo, the Ford Focus logo, the Ford Econoline 150 logo, the Ford Ranger logo, and the Ford Taurus logo.  Document No. 60, ex. 1.

stickers, banners, posters, and advertising materials bearing
Ford's logos.  NBFP represents that it has not manufactured or sold
any products with Ford logos after receiving Ford's cease and
desist letter.  Prior to that time, according to the uncontroverted
summary judgment evidence and arguments of counsel, NBFP engaged in
essentially four categories of sales, and also displayed Ford's
marks in its marketing efforts on its several websites.  First,
NBFP sold various materials and products bearing Ford logos to a
half dozen or so authorized Ford dealerships which, Ford concedes,
are entitled to have and to use the Ford trademarks in connection
with selling Ford's products as long as such use is in the "manner
and form" approved by Ford.  Second, it appears from various of the
summary judgment exhibits, NBFP sold products bearing Ford logos to
non-Ford dealerships that were apparently engaged in the sale of
used vehicles, such as to Tomball Dodge, North Freeway Autoworld,
and Greenspoint Dodge Used Car Sales (*see* Document No. 60, ex.
4-40).  Third, NBFP manufactured and sold to a customer the
customer's submitted design for a decal with a white background,
printed in blue and red colors, bearing the Ford oval logo, as well
as the logos of Chrysler and GM, with the additional bold printed
declaration, "NO BIG 3 BAILOUT," which decal evidently was intended
for use as a political statement (id. at ex. 4-40).  And fourth,
NBFP offered for sale on its website decals embodying Ford's
trademarked logos.  The summary judgment evidence shows that NBFP

3

sold from its website a decal bearing the Ford blue oval logo to Prestige Auto Service, c/o Thomas Chan, in California, who was referred to in oral arguments as a mechanic (id. at ex. 4-36).

NBFP's websites state that by clicking "Go" or "Enter" a "representation and warranty [is made] by you that you have the right to use and authorize the reproduction of any artwork submitted or requested by you." The webpage also contains a notice that the vendor "is not affiliated with, sponsored by, licensed by, or associated with any company," and that the product logos previewed on the website are "for demonstration purposes to show examples of our graphics capabilities or previous work done. Any artwork requested or submitted by you is a representation and warranty that you have the right to use and authorize its reproduction."

Ford's motion is for summary judgment denying all of NBFP's claims and granting judgment of liability on all of Ford's counterclaims.

## II. Summary Judgment Standard

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interroga-tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

4

and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's]

favor, then summary judgment is improper." <u>Id.</u> Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

To withstand a no-evidence motion for summary judgment, the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 106 S. Ct. at 2552.  If the nonmovant fails to make such a showing, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment must be granted.  <u>Id.</u>

### III.  <u>Discussion</u>

A.  <u>Categories of NBFP's Products</u>

Ford asserts that it is entitled to summary judgment on all four categories of NBFP's products because NBFP is not authorized to reproduce Ford's trademarked logos.  "[T]he mere reproduction of a trademark does not constitute trademark infringement if there is no likelihood of confusion or dilution." 4 MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:28 (4th ed. 2009).  Ford ignores

the significant differences between these products, and genuine issues of material fact exist regarding the first and second categories of NBFP's products.[3]

The third category is limited to one product--the "No Big 3 Bailout" decal.[4]  This decal does not use Ford's mark to identify Ford as the source or sponsor of the decal; it merely uses the mark to identify Ford as one potential recipient of "bailout" funding that is the subject of criticism.  Therefore, it is non-infringing because there is no likelihood of confusion that Ford sponsored, endorsed, or is otherwise affiliated with the decal.  Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 900 (9th Cir. 2002) (holding that music companies' use of the "Barbie" mark in song that criticized Barbie and the values she represented was not, as a matter of law, likely to confuse listeners in to believing that the toy manufacturer was associated with the song).  Likewise, this decal does not dilute Ford's mark.  The Trademark Dilution Revision

---

[3] For instance, regarding the first category of products-- advertisements printed at the request of Ford's dealers--Ford has failed to proffer competent summary judgment evidence proving its assertion that Ford's dealers are prohibited from ordering banners, stickers, and decals from printers that are not Ford licensees.  In addition, fact issues exist regarding whether NBFP is an innocent printer because it had an objectively reasonable belief that Ford dealers had permission to order products bearing the Ford logo. Regarding the second category of products--advertisements printed at the request of used car dealerships--Ford has failed to establish that these ads are likely to cause confusion.

[4] Document No. 60, ex. 4-40 at APX 535.

Act of 2006 excludes from liability "[a]ny fair use . . . other than as a designation of source for the person's own goods or services, including use in connection with . . . criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner."  15 U.S.C. § 1125(c)(3)(A)(ii); *see also* Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 266 (4th Cir. 2007) ("Under [section 1125(c)(3)(A)(ii)]'s plain language, parodying a famous mark is protected by the fair use defense only if the parody is not 'a designation of source for the person's own goods or services.'").  NBFP is entitled to declaratory judgment that this product did not constitute actionable infringement or dilution.

The decals and stickers that embody Ford's marks that NBFP has designed and offers for direct sale on its websites--the fourth category of NBFP's products--were the focus of Ford's arguments at the September 30 hearing, and were the subject of Ford's original demand letter and the previous filings in this case.  For the reasons that follow, Ford is entitled to summary judgment on infringement regarding these products.

B.   Trademark Infringement

To prevail on its claims for trademark infringement and false designation of origin regarding this fourth category of products,

Ford must show: (1) it possesses a valid trademark and (2) NBFP's activity creates a likelihood of confusion.  Bd. of Supervisors for LSU Agric. & Mech. Coll. v. Smack Apparel Co., 550 F.3d 465, 474 (5th Cir. 2008).[5]  Here, it is uncontested that the trademarked logos at issue are valid and owned by Ford.  The issue is whether NBFP's use of the marks "creates a likelihood of confusion in the minds of potential customers as to the 'source, affiliation, or sponsorship'" of these products.  Smack Apparel, 550 F.3d at 478 (quoting Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 663 (5th Cir. 2000)).  Courts consider a non-exhaustive list of eight factors when assessing the likelihood of confusion:

(1) the type of mark allegedly infringed;

(2) the similarity between the two marks;

(3) the similarity of the products or services;

(4) the identity of the retail outlets and purchasers;

(5) the identity of the advertising media used;

(6) the defendant's intent;

(7) any evidence of actual confusion; and

(8) the degree of care exercised by potential purchasers.

---

[5] Two Pesos, Inc. v. Taco Cabana, Inc., 112 S. Ct. 2753, 2763 (1992) (stating that "likelihood of confusion" is the test for both Lanham Act infringement and false designation of origin claims).

Id.  "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." Id.

Here, the factors support a finding of a likelihood of confusion. First, it is undisputed that Ford's trademarked logos at issue are strong.[6] Second, NBFP's products at issue consist of exact copies of Ford's marks.[7] Third, it is undisputed that these products are exact copies of products sold by Ford and its licensed marketers. Fourth, NBFP's products directly compete with products sold by Ford and their licensed marketers,[8] and that competition occurs in a relatively small market of buyers--Ford mechanics and customers who seek to show their affiliation with or enthusiasm for

---

[6] Ford Motor Co. v. Lapertosa, 126 F. Supp. 2d 463, 465 (E.D. Mich. 2000) ("[T]here is no dispute that Ford is a famous name and a strong mark.").

[7] Document No. 60, ex. 1.

[8] Document No. 60, ex. 1, ex. 2 ¶¶ 10, 12-14 (Kosofsky Decl.).

the Ford brand.[9]   Fifth, these products are sold on the web by
NBFP, Ford, and Ford's licensees.[10]

Sixth, NBFP intentionally copied Ford's marks.   In Smack
Apparel, the Fifth Circuit found that the defendant--a shirt
manufacturer--intentionally   infringed   various   universities'
trademarked color schemes and indicia with its shirt designs.   See
id. at 481-82.

> [The defendant] did not hope to sell its t-shirts because
> of some competitive difference in quality or design
> compared with the Universities' licensed products, but
> rather it intended to take advantage of the popularity of

---

[9] See Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,
457 F.3d 1062, 1076 (9th Cir. 2006).   In Au-Tomotive Gold, the
Ninth Circuit found that Auto Gold--who made key chains and license
plate covers with VW and Audi trademarks--was liable for trademark
infringement.   In the likelihood of confusion analysis, the Court
stated the following:

> Auto Gold's products, which incorporate exact copies of
> those marks, compete with accessories sold by Volkswagen
> and Audi through their licensed marketers, and are
> related to Volkswagen and Audi's primary goods--cars.
> Although Volkswagen and Audi license their marks to third
> parties, and Auto Gold sells its products to the
> wholesale market, the ultimate consumers are the same.
> In fact, according to Auto Gold, it is a very specific
> sub-group of consumers that wants either Auto Gold's or
> Volkswagen and Audi's accessories--Audi or Volkswagen car
> owners who want accessories to match their cars.   Thus,
> in addition to being related products bearing identical
> marks, the products at issue are destined for the same
> buyers.

Id.

[10] Document No. 60, ex. 2 ¶¶ 13-14 (Kosofsky Decl.), ex. at 16-
24 (John Atkinson Depo.).

the Universities' football programs and the appearance of
the school teams in the college bowl games.

Id. at 482.   The same is true here.   NBFP does not allege its
decals and stickers are somehow superior to or different from
licenced Ford products; NBFP sells these products intending to take
advantage of the popularity of Ford's marks.

The seventh factor is evidence of actual confusion.   Relevant
to this factor is the disclaimer that NBFP presents on its website
to online customers.   NBFP states on its website that it "is not
affiliated with, licensed by, or endorsed by any company," and also
requires customers to click a box that reads, "By clicking
'Continue' you convey to [NBFP] you have authorization, if
required, to use the above artwork."[11]   "Courts have been
justifiably skeptical of such devices--particularly when exact
copying is involved."   Au-Tomotive Gold, 457 F.3d at 1077 (citing
Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d
1079, 1093 (7th Cir. 1988) ("[W]here the infringement in issue is
a verbatim copying . . . plaintiff's reputation and goodwill should
not be rendered forever dependent on the effectiveness of fineprint
disclaimers often ignored by consumers.")).   Here, Ford has
presented no evidence of actual confusion.   Neither, however, has
NBFP presented any evidence that its disclaimers had any effect.

_____

[11] Document No. 37, ex. 2 at 7.

12

Id. at 1078.  Indeed, at the September 30 hearing, NBFP conceded that it knows of *no customer* that has ever declined to purchase products bearing trademarked logos because of these disclaimers. Moreover, these disclaimers "do nothing to dispel post-purchase confusion."  Au-Tomotive Gold, 457 F.3d at 1078; Elvis Presley Enter., Inc. v. Capece, 141 F.3d 188, 204 (5th Cir. 1998) (stating that post-sale confusion "is relevant to a determination of a likelihood of confusion" (citing 4 McCarthy, *supra*, §§ 23:6-:7 (4th ed. 2009))).  After the sale, these products "display no indication visible to the general public that the items are not associated with [Ford]."  Au-Tomotive Gold, 457 F.3d at 1077-78.[12]

In sum, the uncontroverted summary judgment evidence viewed in light of the foregoing factors establishes as a matter of law a likelihood of confusion as to source, affiliation, or sponsorship of this category of NBFP's products.  NBFP has offered no summary judgment evidence to refute Ford's proof of infringement; instead, NBFP raises four defenses.[13]

---

[12] The parties did not present evidence regarding the eighth and final factor--degree of care exercised by purchasers.  This is not determinative.  *See* Smack Apparel, 550 F.3d at 478 ("No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors.").

[13] Ford seeks the same remedies under 15 U.S.C. §§ 1116, 1117, and 1118 for both its infringement and its dilution claims.  *See* Document No. 28 at 16-18, 20.  Because NBFP is liable for trademark infringement for this fourth category of products, the dilution claim need not be discussed.

C.   NBFP's Defenses

    NBFP's four defenses are: (1) it is not making a "trademark use" of Ford's marks; (2) it is protected by the first sale doctrine; (3) it is making a nominative and classic fair use of Ford's marks; and (4) it is a statutory "innocent" printer.

    1.   Trademark Use of Ford's Marks

    NBFP asserts that it is not making a "trademark use" of Ford's marks because its decals and stickers embodying Ford's marks are unattached to any product.[14]   A cause of action for trademark infringement or dilution requires a showing that the trademark at issue was used in connection with goods or services.   15 U.S.C. § 1114(1); 15 U.S.C. § 1125(a)(1).   In Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturers, Inc., the Fifth Circuit held that fabric patches embodying the plaintiffs' team logos were not merely reproductions of the mark, and were attached to goods.   510 F.2d 1004, 1011-12 (5th Cir. 1975).

        Defendant is in the business of manufacturing and
        marketing emblems for wearing apparel.  These emblems are
        the products, or goods, which defendant sells.   It
        becomes clear that defendant's use of plaintiffs' marks
        is in connection with the sale, offering for sale,
        distribution, or advertising of goods.

_____

    [14] Document No. 64 at 20-21.

14

Id. (internal citations omitted); *see also* Ford Motor Co. v. Greatdomains.com, Inc., 177 F. Supp. 2d 635, 654 (E.D. Mich. 2001) (interpreting Boston Hockey). Here, the "goods" at issue are not the marks themselves, but the stickers and decals embodying those marks. Thus, NBFP is using Ford's marks in connection with the sale of goods.

    2.   First Sale Doctrine

NBFP also argues that it is protected by the "first sale" doctrine. The "first sale" doctrine provides that

> "[t]rademark law *generally* does not reach the sale of *genuine* goods bearing a true mark even though such sale is without the mark owner's consent. Once a trademark owner sells his product, the buyer *ordinarily* may resell the product under the original mark without incurring any trademark law liability."

Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 1303 (5th Cir. 1997) (emphasis in original). Here, NBFP is not reselling genuine Ford goods; it is producing counterfeit Ford goods. The first sale doctrine does not apply.

    3.   Nominative and Classic Fair Use

NBFP also asserts that it is making a "fair use" of Ford's marks. "There are two types of noninfringing uses of another's mark that are both known under the label of 'fair use'":

(1) classic fair use and (2) nominative fair use.   2 McCARTHY, *supra*, § 11:45.   The doctrine of classic fair use applies to trademarks that are descriptive terms.   Id.   Here, Ford's trademarks are not descriptive terms, and NBFP is not using Ford's marks in a descriptive sense.   Therefore, the classic fair use defense does not apply.

Nominative fair use arises when the alleged infringer uses the trademark holder's mark to identify, describe, or compare the *markholder's* product.   Id.   "In order to avail oneself of the nominative fair use defense 'the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder.'"   Smack Apparel, 550 F.3d at 489 (quoting Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 546 (5th Cir. 1998)).   In Smack Apparel, the Fifth Circuit rejected the infringer's argument that its shirt designs containing the universities' colors and indicia were nominative uses.

> Smack used the Universities' colors and indicia in more than a nominative sense. It did not incorporate the colors and other indicia to *describe or compare* its shirts with shirts licensed by the Universities, nor did it do so to tell the public what it had copied.  Smack did incorporate the marks to identify the Universities as the subject of the shirts, but it did so in a way that improperly suggested affiliation, sponsorship, or endorsement. . . . Such an attempt to capitalize on consumer confusion is not a nominative fair use.

16

Id. at 471-72 (emphasis added) (internal footnotes omitted). Likewise, this category of products does more than identify or describe Ford; they embody Ford's trademarked logos in a manner likely to cause confusion about whether Ford sponsored or approved them.  Thus, the nominative fair use defense is inapplicable.

4.   Innocent Printer

NBFP also asserts that it is an "innocent printer" under 15 U.S.C. § 1114(2)(A).[15]  Section 1114(2)(A) provides the following:

> Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

15 U.S.C. § 1114(2)(A).  An innocent printer must have an objectively reasonable belief that its prints do not violate trademark law.  Dial One of the Mid-South, Inc. v. BellSouth Telecomm., Inc., 269 F.3d 523, 526 (5th Cir. 2001).  In support of this defense, NBFP argues that it has "no knowledge of any infringing users" because all of its online customers must check that they are "authorized" to use Ford's marks.[16]  Under the

---

[15] Document No. 38 at 4.

[16] Document No. 38 at 8.

objective reasonableness test, "[p]rinters 'cannot be naive and be like ostriches and put their heads in the sand and ignore obvious facts.'" 4 MCCARTHY, *supra*, § 25:29 (quoting <u>Polo Fashions, Inc. v.</u> <u>Ontario Printers, Inc.</u>, 601 F. Supp. 402, 403-04 (N.D. Ohio 1984) (adopting the objective reasonableness test)). Here, NBFP's blind reliance on such "check the box" representations from a universe of unknown internet purchasers affords no objectively reasonable basis for an honest belief that these purchasers are in fact authorized to order Ford's marks from NBFP. Indeed, NBFP conceded that it knows of no customers who declined to order products bearing trademarks after seeing NBFP's "check the box" representation language and its disclaimers. NBFP has failed to proffer evidence creating so much as a genuine issue of material fact that it is an innocent printer in regard to this category of products.

### IV.   <u>Order</u>

Accordingly, it is

ORDERED that Defendant Ford Motor Company's Motion for Entry of Judgment by Default (Document No. 60) is DENIED. It is further

ORDERED that Defendant Ford Motor Company's Motion for Summary Judgment (Document No. 60) is GRANTED on its claim of infringement for the fourth category of NBFP's products, to wit, the decals, stickers, and other products embodying the following Ford logos: Ford's blue oval logo, the Ford Credit logo, the Lincoln logo, the

Mercury logo, the Ford Mustang logo, the Ford F-150 logo, the Ford F-250 logo, the Ford Expedition logo, the Ford Explorer logo, the Ford Focus logo, the Ford Econoline 150 logo, the Ford Ranger logo, and the Ford Taurus logo.  The foregoing marks are referred to as "Ford's Marks" in the injunction that follows and are exhibited in Attachment "A" to this Memorandum and Order.  Ford's Motion is otherwise DENIED.  It is further

ORDERED that Plaintiff National Business Forms and Printing, Inc., its employees, agents, successors and assigns, and all those in active concert and participation with them, and each of them who receives notice directly or otherwise of this injunction, is permanently enjoined from performing, without authorization from Ford or its licensees, all of the following:  advertising for sale, displaying on the internet, offering for sale on the internet, manufacturing, producing, transferring, consigning, selling, shipping, or otherwise moving in commerce any and all goods, decals, stickers, banners, packaging, products, or other materials that embody any of Ford's Marks.  It is further

ORDERED that Plaintiff National Business Forms and Printing, Inc., is awarded declaratory judgment that as a matter of law the "No Big 3 Bailout" decal does not infringe or dilute Ford's blue oval logo.[17]

_____

[17] The "No Big 3 Bailout" decal is found in the summary judgment evidence at Document No. 60, ex. 4-40 at APX 535.

Remaining for trial are the following: (1) NBFP's claims and Ford's counterclaims on whether NBFP's sales to used car dealers and to licensed Ford dealers of decals, stickers, and other products bearing various of Ford's Marks infringed and/or diluted those Ford Marks;[18] and (2) Ford's damages for NBFP's infringement of Ford's Marks for which Ford is awarded summary judgment and an injunction in this Memorandum and Order.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this 30th day of October, 2009.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

[18] If Ford intends to pursue dilution claims regarding these products at trial, it must proffer evidence showing that *each* mark it alleges was diluted has achieved the requisite degree of "national fame" necessary to support a trademark dilution claim. 15 U.S.C. § 1125(c)(2)(A) ("[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."); Bd. of Regents, Univ. of Tex. System v. KST Elec., Ltd., 550 F. Supp. 2d 657, 674-79 (W.D. Tex. 2008) (finding that evidence failed to show an extremely high recognition of the university's longhorn logo necessary to show national fame under the TDRA).